I'm Jim Coleman. I'm representing the appellant, Charles Ray Finch. I would also like to introduce my co-counsel, Nita Farahani, who is also on the faculty at the Duke Law School. Your Honors, Mr. Finch was convicted in 1976 for a murder based on a theory that he personally shot the victim with a sawed-off shotgun. And the principal witness against him was an eyewitness who first identified Mr. Finch from three highly suggestive, unnecessarily suggestive lineups. And then later identified him in court under similarly highly suggestive circumstances. The evidence at the trial consisted of the eyewitness identification. As we say, the unreliable, in fact, constitutionally unreliable identification. In the face of what the North Carolina Supreme Court described as substantial and detailed alibi witnesses. Who accounted for Mr. Finch's whereabouts from around 6 o'clock the night of the murder until 9.30 that night, which was a half hour after the murder had occurred. He was in downtown Wilson, engaged in a card game, and other participants in that game testified that he was there, including the individual who took Mr. Finch's place at the card table. The state's principal claim was that the eyewitness saw Mr. Finch kill the victim with a sawed-off shotgun. And that the sawed-off shotgun, a blast from the shotgun, about two feet between the person with the gun and the victim, was the cause of death. New evidence since the trial makes it clear, indisputably clear, that the victim did not die from a shotgun blast. The person who performed the autopsy, whose autopsy report in four places indicated that the cause of death was a shotgun wound, later admitted that that was wrong. He was initially confronted by the chief medical examiner in North Carolina, Dr. John Butts, who expressed the opinion that the victim did not appear to die from a shotgun wound. He contacted the person who had performed the autopsy. He agreed in a letter to Dr. Butts that that was an erroneous characterization of the cause of death. Well, let me ask you this, and it's not clear to me from the record. There was a felony murder charge. Correct. There was. Was that challenged in the state courts, the felony murder charge? I don't believe that it was. So aren't we facing a procedural bar? I don't understand what would be the procedural bar. If you didn't raise the felony murder in the state courts. Who did not raise it? Your client. Why would he raise felony murder? Well, it was a pretty sorry charge from my point of view. But his defense has always been that he was innocent. He was not there, was not involved in the felony, and did not commit the murder. And so the question, the state's argument was that he was there attempting to rob the store owner, and that in the course of attempting to rob the store owner, he shot him. That was the felony murder claim made by the state. But our claim is that Mr. Finch was not involved in any way. He was not there, period. So it didn't matter to Mr. Finch whether the state's theory was first degree murder based on premeditation, or whether it was first degree murder based on a death that occurred in the course of the robbery felony. A felony murder wouldn't squash his defense, because his defense, I wasn't there. If he said I was there, but I didn't shoot him, then felony murder would. Well, Judge Gregory, actually that would not have been a defense either, because then he would have been, and in fact I think that's what the state is trying to rely on now, is that he was, I think they pretty much at least implicitly concede that Mr. Finch did not personally kill the victim. But they're claiming that he was there with the person who did kill him, and therefore he is guilty of felony murder as an accomplice to the felony. Do the jury instructions play into the analysis of actual innocence in this case? And the reason why I'm asking you, Mr. Coleman, and I'll be asking your opposing counsel the same question, is the jury instructions strike me as very confusing. Yes. They instruct the jury essentially on felony murder without calling it felony murder. Correct. But then directly below that, tell them that they have to find that he was the trigger man. Correct. Which of course is not required under felony murder. Correct. Does the fact that those instructions were confusing and even contradictory in a very basic principle, does that affect our analysis or not? Since actual innocence is usually thought of as a factual inquiry, and I think properly so. I think that's right. Do we even look at that or not? Well, I think you look at it because I think that what the court has to consider is what is the case that the state presented to the jury. And in this case, the case that the state presented to the jury was that Mr. Finch was the person who personally killed the victim. But I agree with you, Judge Kinnan, that the instructions are confusing in the sense that in addition to focusing on the jury having to find that Mr. Finch was the killer, the actual killer, the court instructed the jury, the court also says, almost as an aside, but if he was not the killer, that doesn't mean he would not be guilty. But that's pretty much the extent. Excuse me, I'm sorry, I didn't mean to cut over you there. Yeah, the court said whether or not this defendant is the person who shot the gun does not mean he would not be guilty. And then a couple paragraphs later says the state must satisfy you beyond a reasonable doubt that the defendant actually shot Mr. Holliman. Correct. And the consequence of that is that on that charge, which was the focus of both the jury, the judge's instructions, as well as the prosecutor's arguments, the prosecutor said to the jury, whether or not you in the end believe that Mr. Jones saw Mr. Finch shoot the victim with the shotgun, he'll go to his grave knowing that that was the case. The state's theory, the only theory that they argued was that Mr. Finch killed the victim with the shotgun. They didn't say, they didn't argue in the alternative, but you could also find that if somebody else did. Right, so that gets back to my question. How does that play into the actual innocence inquiry, which is essentially factual in nature? Well, so the actual innocence inquiry is whether he is innocent of the case that was presented by the state. Was he innocent in the sense that he was not the person who personally killed the victim with the shotgun? The court instructed the jury that to find Mr. Finch guilty, you have to find that he shot the victim with a sawed-off shotgun and that the victim died as a proximate cause of that. So if you focus on that instruction, then Mr. Finch, and I think probably the state would have to admit that Mr. Finch would be innocent of that, that's no longer their argument even that he was the actual killer. Now you talk about the identification, the lineup and the later in-court identification as being constitutionally infirmed. Are you trying to essentially bootstrap a constitutional argument onto the actual innocence inquiry? Is that proper? Well, I'm not trying to do that, but obviously in our brief, we talk about the constitutional standard, not in the sense that therefore you shouldn't consider the eyewitness identification, but that you should take into consideration that the eyewitness identification was so unreliable that not only would it not have served as a basis to find Mr. Finch guilty beyond a reasonable doubt, that is a reasonable juror finding him guilty beyond a reasonable doubt, but that in fact the eyewitness identification would not have been presented to the jury, should not have been presented to the jury, because both the lineups as well as the manner in which the witness identified Mr. Finch in court was impermissibly suggested, and I think it's almost exactly like the situation in this court's decision in United States v. Green. He was shown a photograph of the lineup. He was asked who was the person in the lineup you selected. He said number four. They then circulated the photograph of the lineup to the jury, and then they asked him whether he saw the man in the courtroom whom he had selected. Yes, that's Mr. Finch sitting there at the table with his attorney. What the court said in United States v. Green is even aside from the lineups, pointing out the defendant as the person sitting at the table with his lawyer is a suggestive identification. In this case, it was explicitly tied to the lineups that the deputy who set them up acknowledges were unfair. And what that does is it not only undermines the credibility of the eyewitness identification, it also undermines the credibility of other evidence in the case. It undermines the credibility of the deputy on whose testimony the state also relied. With regard to the eyewitness identification, the obvious defect in it is the fact that Mr. Jones said that the shooter was wearing a three-quarter length coat, and then they only put the three-quarter length coat on one person, your client, in the lineup. What were the other factual errors that made the lineup overly suggestive and unconstitutional? Well, what appears to have happened in this case is that when Mr. Jones was shown the first lineup, in which, and I think it's at, in the Joint Appendix at page 943, 942. What, apparently what happened was that Mr. Finch was the fourth person in the lineup wearing the three-quarter length coat. He was put in the lineup not on the basis of any description that Mr. Jones had provided. He was put in the lineup because the deputy sheriff ordered the police to arrest him. Because, according to him, he had received a tip that Mr. Finch might be involved in a robbery at some point in Wilson County on some unspecified date, some unspecified country store. And on the basis of that, the deputy claims that he had Mr. Finch arrested and put in the lineup. I don't believe that there was probable cause on those facts to arrest him. The deputy testified at the evidentiary hearing before the superior court that he had no basis at all to believe that Mr. Finch would have robbed anybody based on his past. Because he had never been involved in that kind of criminal activity. He described the kinds of activities as nickel and dime stuff. I see my time, I've reserved time, and so I'll speak after the statement. Thank you. May it please the court, I'm Nick Vlahos, Assistant Attorney General, North Carolina Department of Justice for the State Respondent Appellee. There are two legal disputes at the heart of this appeal, and the resolution of the first dispute points to the resolution of the second. The first legal dispute is whether the district court was correct to consider Jones' in-court and out-of-court identifications of Petitioner as a perpetrator in adjudicating his Gateway Actual Innocence claim. The second legal dispute is whether, after considering all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under the rules of admissibility that would govern the trial, the district court was correct in finding Petitioner failed to show, it is more likely than not, in light of new and reliable evidence, no reasonable juror would find him guilty beyond a reasonable doubt. Now, Petitioner contends the district court erred in considering Jones' in-court and out-of-court identifications of him when adjudicating his Gateway Actual Innocence claim. According to Petitioner, the district court could not consider those identifications because the likelihood of misidentification caused by the lineup procedure violated his right to due process. In essence, what Petitioner is arguing is that if the court will just grant me the relief that I've requested in my constitutional claim, then you'll see how, quote, actually innocent, unquote, I am so I can get through the gateway so I can argue my constitutional claim. But that's not the standard that Schlupp sets out. To properly adjudicate a Gateway Actual Innocence claim, a federal district court must consider, and this quote after the must is a quote from House v. Bell, which is floating Schlupp, must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under the rules of admissibility that would govern a trial. And digging a little bit deeper into Schlupp, because I want to make sure I understood that for what it is, if you dig a little bit deeper, the Supreme Court says, in the majority opinion, they cited something that Judge Friendly had said in a past case, and said, we believe that Judge Friendly's description of the inquiry is appropriate. The habeas court must make its determination concerning the petitioner's innocence in light of all the evidence, including that alleged to have been illegally admitted, parentheses, but with due regard to any unreliability of it, and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial. In other words, and these are my words, in other words, any alleged constitutional deficiency of the evidence presented at trial goes to the weight rather than the admissibility of that evidence in determining whether petitioner made a sufficient showing of actual innocence. That's what we're arguing to you. Petitioner says, you can't consider that evidence, okay, because of the way the lineups were conducted. And the state argues to you, you have to consider that evidence under the Schlupp standard. Well, I think Mr. Coleman's saying, yeah, you can consider it, but it's just so infirm. You know, they put a coat on only one person, my client, and they really didn't have any basis for putting him in the lineup except for some sort of a tip that he might be doing some robbery somewhere sometime. Isn't that something that weighs into it? Your Honor, that does weigh into it, but they did have a reason for putting him in the lineup, okay? Deputy Owens had the tip that petitioner and others, a couple others, were going to go out and rob a store in the county that weekend. Then he talked to Noble Harris. Noble Harris showed up at the scene about 10 p.m. on the same night Holloman was killed. Deputy Owens talked to Noble Harris about it. Noble Harris lives less than a mile away from Holloman's store, or he lived there at the time. His kids were coming home from a basketball game and told Noble Harris, hey, there's something going on at Holloman's store, so he went to see. When he found out Holloman had been killed, he went up there to find out because he had been up there earlier that night. And when he talked to the law enforcement officers, he told Deputy Owens that he arrived at the store about 7.45 p.m. and he left the store about 8.20 p.m. He went in there to buy beer and a quart of wine. And as he was leaving, he walks outside and he sees a blue Cadillac that he knows belongs to petitioner. And coming out of the driver's side of that blue Cadillac was petitioner. He saw him. And this is a man who Harris knew for 10 years. It's not like he just kind of knows him from around. He's known the man for 10 years. And as petitioner gets out of his blue Cadillac and Harris kind of passes him going to his car and gets in his car as he's getting ready to pull off, he says, what you say, Finch? And somebody replies to him, what you say, Harris? Now he identified and saw Mr. Finch get out of his blue Cadillac, but there were other people in the Cadillac. So he didn't know who else was with him because Finch was the only one he saw get out. Okay. Best that says that, okay, there's another reason to put him in the lineup, right? Okay. We know the facts, the record. So, but how does that deal with the person who is to identify him? It was not based on any description really of him, right? Other than the coat he's wearing. No, it was your honor. It was based more, uh, the description, the height, the weight, things like that were given about both of the suspects. Okay. Um, Jones described petitioner as a black male, about 35 years old from five foot nine inches to six feet tall, weighing from one 50 to one 65 pounds with a dark complexion who was wearing a light colored stocking for a hat, dark pants, and a dark three quarter length. Do you think that's a very constricting description? Black male, five, nine to six feet tall, about 35 years old. You think that's pretty, that's pretty narrowing? Not by itself. Your honor. Okay. It narrows it pretty well. It does. But there's, well, there's more on top of that. He described the other perpetrator, the man in the red and white checkered shirt. He told Deputy Owens that petitioner was in the company of a black male, about 28 to 30 years old from five foot seven, eight inches tall, weighing from 150 to 170 pounds with light complexion of thin mustache and quote kinky unquote hair who was wearing a red and white toboggan and a red and white checkered shirt with long sleeves and dark pants. Now, that's the description again. One has a dark three quarter length coat. The other one has on a red and white checkered shirt with long sleeves. That's pretty distinctive. Okay. All right. So why do you put the coat on him? Your honor, I'm going to argue to you. No, you don't need to argue. Just answer the question. If you want, because this is about the truth, right? Yes, sir. Wouldn't you want the person to identify the person? Yet you put the one describing thing, the article of clothing on one person. Wouldn't you want to make common sense? Let me see. I want to get the truth. So I'm going to put six people, other people up there and say, can you identify the person? That's like saying the person had a pink and green and yellow coat on. And then you put one person with a pink and green and yellow coat on. You said, which one do you think it was? Don't you think that's common sense? I know you represent North Carolina, but don't you think that's suggestive? Your honor, I'm going to argue to you. I'm just saying that maybe I'm missing something. Don't you think that's suggestive? Not under the totality of the circumstances of the way the lineup was arranged, your honor. What about that aspect of it? Do you think that is suggestive? That particular, only that aspect of it. Yes. Is that a yes? I would argue to you. Is that a yes? I'm not laughing. Is that a yes? I'll tell you what the discipline is. No, just tell me to answer the question. Is that suggestive? It could be, your honor. Okay, go ahead. I see you. Go ahead. It could be, but same lineup. I'm talking about justice here in the Constitution. A lineup is to help police officers who do a good job trying to solve crime, but lineups to help get the right people charged. And you're saying that's not suggestive? Or it could be? I'm arguing to you this. The way Deputy Owens conducted that lineup in 1976, okay, was pretty progressive for back then. They brought Jones up there and they did not tell him they had arrested anybody. They didn't tell him they had a suspect in the lineup, okay. They didn't tell him any of the names of any of the people in the lineup. He walked in to go see the people and was told not to make a comment and come out. Then they had him come out and they changed the people around in the order that they wanted. Who was wearing the coat? The petitioner was still wearing the same. So you're telling me the first time you show him he's the fourth person with a coat on, the next time you say he's the third person with the coat on. You think that really made a difference? He's telling me that's like shuffling. But law enforcement did not put him in that coat. They didn't make him wear the coat. He was wearing it when he was arrested. And Charles Lewis was wearing the same red and white checker shirt. If he had a hat on covering his face in the lineup when you arrested him, do you think you'd make him take that off? I don't know, Your Honor. I just know that what they arrested him in, they brought him in there and put him in the lineup. He's been in prison how many years? 40 years? Yes, Your Honor. Do you recall whether there was a specific verdict form where the jury selected whether they found him guilty of felony murder or first degree murder? Do you remember that? I do not recall that particularly, Your Honor. But I do know that they were instructed on felony murder and that the district attorney, the elected district attorney who tried the case, argued felony murder to them. Then why did the court say you have to find that he actually shot Mr. Holliman? I have no idea, Your Honor. I mean, to me, it's just an inherent contradiction in the instruction. You don't have to find that he actually shot him, paragraph one. Paragraph three, or whatever it was, puked down. You do have to find that he actually shot him. How in the world do we have confidence that the jury sorted things out? I think the district court in this case actually pointed out where the court in its instructions, the state trial court, told the jury that they could find that the petitioner or one of his accomplices shot him. And I don't have the opinion sitting in front of me. But in that opinion, he cites the part of the jury instruction. Right, but I can cite to you the jury instruction at 671-672, which says the state must satisfy you beyond a reasonable doubt that the defendant actually shot Mr. Holliman. And, Your Honor, if we're going to go down that route. Well, to what extent? I don't mean to cut you off, but it's the same question I asked Mr. Holliman. To what extent does this bear into our actual innocence analysis? In other words, is this a factor that we have to consider or not? I don't think so, Your Honor. Why not? Because they were instructed on felony murder. And they were allowed to find him guilty based on felony murder and acting in concert, which the state argues to you they did. Now, further into that argument or to answer your question about why the judge might have instructed them about finding that he actually shot him with a shotgun, you've got the evidence from Dr. Habrian. And in post-conviction, from what the defendant put on in the evidence, Dr. Habrian actually recovered a pellet of number one buckshot from the shoulder of Mr. Holliman. And that was proved up by the lab report. They sent State's Exhibit Number 8 and State's Exhibit Number 15, the shotgun shell and the pellet. The pellet was the one recovered from Mr. Holliman's shoulder by Dr. Habrian during autopsy. He described it as a slightly distorted oval-lead pellet. And the State's simple argument on that is the logical conclusion is if you're taking a piece of number one buckshot out of the victim in this case, then it's obvious that one of the pellets, or at least one of the pellets, hit the victim and caused his death. Because there were two wounds. One wound entered right above the collarbone, right where it has a junction with the breastbone. And it went all the way through the neck into the back. And that's the one that got lodged in the shoulder. It did major damage to his neck and arteries. And it ended up in the back shoulder where Dr. Habrian recovered it. Then the other wound came from the back shoulder blade, went in, hit the second rib, and then either fragmented in there to where you couldn't identify what it was, or went back out the back where the exit wound was that could have been a bone or could have been a projectile. And they found in the gurney that they had wheeled him into the medical examiner or the forensic pathologist's office on, he found a copper-jacketed or a brass-plated lead slug. And there's evidence that not only was the sawed-off shotgun fired in Holloman's store, but another weapon was fired in Holloman's store. The sawed-off shotgun, Holloman had fired one shot. There was only one spent shell casing inside his revolver, indicating he only fired one. His were only lead bullets. They were not jacketed. But they found around the store several pieces of and several copper-jacketed bullets is the way they described them. 38 caliber copper-jacketed bullets. So you've got three weapons. Holloman's weapon, which he obviously didn't fire himself. You've got the sawed-off shotgun that has number one buckshot pellets in it. And you've got the 38 caliber firearm of some type that's fired. Now, Dr. Habrian testified that he didn't know whether the wound caused to Mr. Holloman was caused by a rifle, a shotgun, or a pistol. In fact, his testimony at trial was completely inconsistent. He never called this a shotgun wound at trial. He only called them two gunshot wounds. He called them shotgun wounds in his report of autopsy examination, but that was never introduced into evidence at trial. So all the jury heard was two gunshot wounds. And the jury also heard, don't know whether it was caused by a shotgun, a rifle, or a pistol. So based on that evidence is how they convicted him. The logical argument here is he was hit. One was five millimeter entrance wound from the front, and one was an eight millimeter entrance wound from the back. That supports the theory that he was shot with two different projectiles in him. One from the front, one from the back. One that made a five millimeter hole that we know is the overlead pellet, okay, of number one buckshot. And one that could have been a brass plated lead slug, or it could have been another piece of buckshot that atomized inside of him. So that's basically the state's argument for why the judge might have instructed on that, Your Honor. But he was convicted under a theory of acting in concert. So it doesn't matter whether he fired the other gun or the co-defendant fired the other gun. It doesn't matter what the court instructs the jury. I thought that's what matters completely. They're the trials of fact, but the judge is the sole, sole source of the law. Yes, Your Honor. And the sole source said you have to find that he actually shot him, notwithstanding his felony murder instruction, right? Aren't they required? Matter of fact, we presume that they listen to everything the judge instructs them to do, don't we? That's correct, Your Honor. You can't have it both ways. They'll come here all the time. We presume that they did exactly what the judge told them, but now you're saying that they just ignored that? No, Your Honor. I'm saying to you. They followed it, right? I'm telling you they followed it. They followed it, correct? Yes, Your Honor. They followed the judge's instruction. And following it means that they had to find that he was the shooter, not felony murder, but that he did it. And that became an element of the offense. And the question is, is he actually innocent of that? The judge raised the bar. I don't think the judge raised the bar, Your Honor, because he instructed him on felony murder. All you can say about the jury instructions is that they're confusing, okay? I agree with you on that. They are confusing. But he instructed on felony murder, so the jury could have found him guilty on the theory of felony murder, okay, and acting in concert. It's clear that he instructed on both of those. I have done that and followed the court's instructions. You tell me that. How could they? I can't tell you that. And why is it? Because I don't know what the jury did in deliberations. I can't tell you where they sat around and said it. The presumption is that they followed the court's instructions. I agree with you, Your Honor. The presumption is that they did. But even if they did, one of the two shots that caused his death, because both were lethal, the one that went through the neck, the one that went through the other way, one of them we know was caused by a piece of number one buckshot. And the logical conclusion the jurors could have reached is that it was fired by the sawed-off shotgun that Petitioner fired at Mr. Holliman. We know now that the report is wrong. It was wrong. It never should have said shotgun. It should have been gunshot. We now know that. The report is whatever Dr. Habrian says it is, but the testimony at trial is what he was convicted on, Your Honor. The report never made it to the jury. The testimony at trial was gunshot wounds, not shotgun wounds. But in the report, weren't you required to make that discovery to the other side? Absolutely, Your Honor. Doesn't that have a big factor in terms of defense and what's available? You don't think it makes any difference if it had accurately said it was gunshot, not shotgun? And there's no evidence that it wasn't given over. The defense attorney filled out an affidavit and did not say it wasn't given over. But that's the whole point. Yes, it was given over, and it informs your defense. It'd be a lot different if you said, wait a minute, it's nothing about shotgun, because they made a big deal about the kid finding the shotgun shell in the car, right? Yes, Your Honor. That was a big deal, wasn't it? Yes, Your Honor. It adds up. Yeah, it does. Essentially, what the state is arguing to you is that we're just asking you to add up the facts. What are the odds that on the night Holloman was killed, a man fitting the description of the person who fired the shot off shotgun at Holloman while attempting to rob Holloman's store would be stopped driving a blue Cadillac, wearing a dark three-quarter length coat, in the company of the man fitting the description of the coat conspirator who asked for an Alka sensor, right down to the long sleeve red and white checkered shirt he was wearing, with a number one buck Western Winchester shotgun shell in the left rear door ashtray of the blue Cadillac? And on top of that, what are the odds that the same man would be seen getting out of his blue Cadillac, outside of Holloman's store, by Noble Harris, 40 minutes before the attempted robbery, resulting in Holloman's death, when he was supposed to be playing cards at Tom Smith's shoe shine parlor, according to his alibi witnesses? And that his alibi witnesses were full of holes, because they said he left the card game three times, okay? There were about five people playing at the card game, and there were about 16 people in and out during that entire time in the room where the card game was going on at Tom Smith's shoe shine parlor. Petitioner left one time to go take a man's dog home, who the man had walked up there with, and tie it up outside his house so his wife can get it. Petitioner left a second time so he can go take a man's wife a couple of cheeseburgers, because she was hungry and he didn't want to get up and dope her. And Petitioner was the guy that had the car, so he threw him a couple of bucks, and he took him the cheeseburgers, okay? And then he left a third time, and they have no idea where he went that time, okay? But then Lewis shows back up saying, hey, I was arrested, and they let me go, okay? So he was in and out of that card game, Your Honor, and there are holes all through that alibi. What about the evidence about the circumstances in which Harris identified in terms of his conversation with the deputy? There's an affidavit now. Your Honor, the first thing about the affidavit, it was never presented to the district court. So I'd argue to you that you should consider it. And even if, they still presented a witness upon cross-examination by the defense attorney, and a witness at trial tried to say that Harris said a different thing, that he thought it was Finch, or he thought it was his car, but it really wasn't, giving a prior inconsistent statement. So that was before the jury. At most, all it does is impeach what Harris said. It does not show that the petitioner is actually innocent by the more likely than not standard, okay? And while we're on the standards, what is also important is the, with regard to the identification, the Anti-terrorism and Effective Death Penalty Act provides a, in the habeas proceeding, challenging a state conviction, a determination of a factual issue. Made by a state court, shall be presumed to be correct. The habeas petitioner bears the burden of rebutting the presumption of correction by clearing convincing evidence. In Sharp v. Bell, this court decided that the state court's fact-finding germane to a habeas petitioner's gateway actual innocence claim are entitled to deference under 28 U.S.C. section 2254E1. Now the state court in this case made two important findings about the identification. First, it found in the joint appendix, page 982, paragraphs 85 and 86, Lester Floyd Jones had ample time and substantial lighting and opportunity to view the shooter at the time of the crime, being within two feet of him when the shotgun was discharged. His attention was directed towards the shooter and he was provided consistent descriptions with the criminal's height, weight, skin color, and clothing. His level of certainty was great and remained so at trial. Finally, there was a short length of time between the crime at approximately 9 p.m. and the confrontation at approximately 1.30 a.m. on the same night early morning. Paragraph 186, based on the totality of the circumstances, the court concludes that the in-court identification of defendant by Lester Floyd Jones is of independent origin based on the witness's observation at the time and seeing the crime and is supported by clear and convincing evidence. Unless petitioner can rebut these findings with clear and convincing evidence, this court must presume they are correct. State court never addressed whether it was suggested, did it, the lineup? It did, your honor. Not what you just read. Well, the next paragraph is paragraph 187 starting on the same page. That the court finds that the defendant appearing in the same three-quarter length dark coat in each lineup may have been possibly suggestive to the witness. May have been possibly suggestive. However, the court finds under the totality of the circumstances and the factors contained herein that there was no substantial likelihood of irreparable misidentification and there is no danger that the lineup tainted the witness's in-court identification of defendant as a person who fired a shotgun. Okay, but the witness did say, Mr. Jones did say that he looked at the lineup before going into the trial, didn't he? To refresh himself as to what the defendant looked like? At the trial, the DA, before the trial, the DA did show him the photographic lineup to refresh his recollection. However, Mr. Jones testified a preliminary hearing before he ever saw any of the lineups at which he identified the defendant. We're talking a preliminary hearing or probable cause hearing like we used to have in North Carolina before they take him straight to the grand jury. So he had a preliminary hearing under statutory right in North Carolina. Jones did not see any photo lineups before that hearing and Jones identified him at the hearing. Well, he was standing up there with his lawyer in a preliminary hearing. Correct, Your Honor, as far as we know. Okay. Well, if you're basing it on the photographs, he identified him without the photographs. Who do you think it might be? I mean, every witness that comes in. I'm sorry. Every witness what? Every witness that comes in and identifies somebody sitting at the defense table is doing it all across America. Yeah, but a lot of times the whole idea is that you're trying to buttress the lineup saying, well, we know it's right because when we saw him in court, he said that was him. I'm asking you to look at all the facts and the factors surrounding this identification that show that it's reliable. It shows it's of independent origin. Counsel, do you think that a lineup can be so suggestive and undermine the idea of fairness and justice that it requires collateral really? Do you think that a lineup itself can be so intrinsically unfair that it undermines what we consider to be justice and our justice system that it requires? And under that hypothetical, yes, Your Honor, a lineup can be. Okay. This lineup was not. Okay. And even if you find this lineup was unnecessarily suggestive, you hit the Neal versus Biggers factors to decide whether it was reliable or not, okay, whether it was of independent origin. Just hit those factors. Look at the facts in the case. Number one, the opportunity of the witness to view the criminal at the time of the crime. Jones saw Petitioner inside and outside of the store for a total of five minutes, okay, under great lighting situation. Jones had plenty of time to view Petitioner while Hallman reached in his pocket, fumbled with his keys, and unlocked the padlock to the front door of the store, all while holding a .32 caliber rifle. I thought the lights were out of the store, that the lighting from the store was from the outside lighting going in. There were two sources of lighting inside of the store. First, on the outside of the store, you've got light fixtures all around the underside of the roof of the store. Okay, it's an overhang. On the front row, there are six lights, okay. Jones testified the ones on either end were 300-watt bulbs because I put them on there myself. Then the four in the middle, he estimated, were about 150-watt bulbs. That's 1,200 watts of light that they're all standing under in front of Hallman's store while Hallman's fumbling around with his keys trying to unlock the padlock, okay. So he sees them there while he's unlocking the padlock. Then inside the store, you've got these two big windows, two feet by four feet, and the lights shining in from the outside. And then in the back wall, there's a clock, 12 inches by 24 inches, like a Budweiser beer clock, and the light is shining from that clock. That light is on, and the light behind him is coming in is on. So Jones got to see Petitioner outside and inside the store. But there's evidence about racial misidentification in this, right, this record? Your Honor, when the expert testified in post-conviction, okay, on racial cross-identification, they asked him the question, okay. Ms. Newman was the attorney at that time from Duke. Asked him the question and said, doesn't cross-racial identification, can't that be a factor? Explain that to me. And he says, well, any factor that could affect the person's ability to identify the person can be considered as a factor to weaken the identification. And I'm paraphrasing horribly, Your Honor, because that's, you know, I'm just telling you what it says, what the expert said. In other words, when the expert was given the latitude by the question, to answer the question, he choked. He didn't give a long explanation about cross-racial identification. He didn't sit there and say how strong it was and how it wouldn't be. Also, looking at the cases that Petitioner has attached, all of them on cross-racial identification, all they do is suggest jury instructions. Jury instructions be given on the issue of cross-racial identification. Not to throw the identification out. Not to say it's not admissible. And even in those jury instructions, the jury instructions recognize. Nobody's talking about inadmissibility. It's a question of weighing it all in terms of that's a factor to be weighed in terms of how much impact this apparel had on the identification. That's what it's saying. It's not a matter of if it's admissible or not. We have to weigh that in terms of you're more susceptible to be in error when it's someone not of your same ethnicity. Your Honor, if Jones is picking out people based on what they're wearing in the lineup, why didn't he identify Lewis in the lineup? He was wearing a red and white checkered shirt. Okay? They were both in the same lineup, and he identifies Petitioner, but he doesn't identify Lewis. Three times he doesn't identify. Weren't you asking who was that shooter? Your Honor? You don't know what you're asking him to identify. They brought him in, and they said, could you please point out anybody you recognize? That's all they said. Okay? And he walked through, then walked out, and told the person, I recognize number so-and-so, and that was Petitioner. He didn't say anything about Lewis. Well, we know everybody in the lineup was African-American, right? Correct, Your Honor. So we know he wasn't just identifying anybody. You said, why would he just pick anybody if he was just race? Nobody said that. It's not a question of somebody being deliberately mean-spirited or being bigoted by race. It's the likelihood that they're in error because of their unfamiliarity. Because the mind works a certain way. I don't want to get into forensic, but the way the mind works is if your mind believes you might know the person, you give more detail to them to see whether it's somebody I know and I don't want to speak to them. But if you categorically think you don't know anybody of that ethnicity, your mind automatically does not go to detail. I think your time is up. I apologize. That's fine. Unless there's another question. Yes, go ahead, Mr. Coleman. Is that true all your expert did was this choke and that's all? I must have fallen asleep. I didn't think the record reflected anywhere near the description. But go ahead. I don't at all. And, in fact, the evidence was offered. It had nothing to do with jury instructions. It was just to make the point that cross-racial identifications are unreliable. And it's a factor like weapon focus, like stress that would affect a person's under some set of circumstances. Let me just try to quickly go through because there's so much to correct here. Let me start with the lighting. The state makes a big deal about the lighting on the outside, on the inside. Here's one thing that we know about Charles Ray Finch on the night of the crime. Joint appendix, page 951, he had facial hair. He had a mustache. He had a beard. He had bushy sideburns. Mr. Jones never, ever identified the person with the shotgun as having facial hair. He never told Deputy Owens that the person had facial hair. So if he's walking under 300 watts of light coming toward the store, I think what we have to assume is that that person did not have facial hair. Because by the state's argument, there would have been sufficient light for him at least to have seen that, and he never identifies facial hair as a characteristic of the person with the shotgun. The other reason he may not have identified facial hair or hair or any characteristics of the person's face was because his first description was that the man had a stocking over his head. So it may have been that the person, he never saw the man's face. But in any event, either he didn't see his face because he was wearing a stocking, or he got a very good look at his face and he didn't see facial hair. So either way you cut that, I think it comes out the same, which is that the identification has no indicia of reliability. On Charles Lewis, the state makes a big deal about Charles Lewis being in the lineup, and he says, well, he didn't pick him. Well, that's because he may not have been the person in the store. There's nothing in the record that suggests that Charles Lewis, in fact, was dressed like the person who robbed the store. There is some reference to a red and white checked shirt, but there's nothing in the record that says that the shirt that Charles Lewis was wearing was the shirt worn by the person in the store. And I think we have to assume that it was not, right? Because if it was, based on what counsel said, the witness was instructed, he would have picked Charles Lewis. He didn't pick him. So we have to assume that he didn't fit the description of the person who was in the store with the man with the shotgun. On Noble Harris, Noble Harris' testimony was that he saw a person he believed was Charles Ray Finch, and that he was in a blue, a light blue Cadillac. There was a question about when did he see this person. Now, on cross-examination, Mr. Finch's lawyer got him to say that it was, it could have been around 7, 730, 820. But when Mr. Harris testified on direct, he said consistently, and he was insistent about it, that it was on the edge of dark. It was not yet dark. He said it was on the edge of dark. According to the Naval Observatory, on February 13, 1976, the edge of dark would have been around 550 to 6-something. So that was the period when all of the alibi witnesses say that Mr. Finch left the game, went out to buy a sandwich for one of the players white, and then returned. Now, counsel says that Mr. Finch's whereabouts were not accounted for after he returned. But that's not true. Every person who testified who played in that game said that Mr. Finch was there from when he returned after 6 o'clock until at least 930 when he left and one of the witnesses took his place. So there was no gaps in where he was. All of his alibi witnesses were consistent. And the North Carolina Supreme Court said that it was substantial, that the evidence was substantial and detailed about the card game. On the shotgun evidence, the state continues to try to make the argument that they made at trial that Mr. Holliman died from a shotgun. There is no evidence that a number one buckshot shell was ever fired in the store. The SBI, the State Bureau of Investigation, ballistics expert noted that when they sent the lead that was recovered at the crime scene, they did not send anything that they called number one buckshot except the one shell that Deputy Owens told them was a number one buckshot. They did not make that determination. That was what they were told when they received the evidence, that it was a number one buckshot. And what they were asked to do was to see if they could match it to the shell that they found in Mr. Finch's car. They were not asked to type it to say whether this was a number one buckshot or not. But what Dr. Henry Haberin says in his affidavit was that he talks about the number of references to shotgun wound in his autopsy report. And he says that all of these references to shotgun wound are erroneous. Each should have said gunshot wound. The wounds suffered by Mr. Holloman were not caused by a shotgun. He also says that when he talks about slug in his report, he says, I used the term slug to describe projectiles taken from Mr. Holloman's body. At the time, my practice was to use the word slug to refer to bullets fired from a handgun or rifle. I did not use the word slug to refer to buckshot or pellets fired from a shotgun. So I think, I don't think this can be disputed. This is the man who performed the autopsy. He says that it was not a shotgun wound. He says the projectiles that he removed were not shotgun pellets. I think that's pretty much it. Let me just make one other point about the lineups. As I said, when Mr. Jones was shown the first lineup, the record is clear that when he viewed the first lineup, he went back and he said that the suspect was in the fifth position. And then he said he corrected that. He meant he was in the fourth position. And then he's shown a second lineup. And in the second lineup, Mr. Finch is moved from the fourth position to the fifth position. And he says the person is in the fifth position. And then he shows him a third lineup in which Mr. Finch, again, appearing in his coat and in a hat. And he identifies Mr. Finch as the suspect again. When we asked Deputy Jones why he showed Mr. Jones three lineups, he said, I did it to be fair to Mr. Finch. But what we know is that the way he set up the lineup was not fair. He admits that it was not fair. And so his purpose in showing him three lineups was not to be fair to Mr. Finch. It was to manipulate the identification so that Mr. Jones got the right person, got the person who was put in the lineup, marked for identification. The person Deputy Owens claims he had a tip was going to rob a country store somewhere in Wilson County sometime that year. We asked the court to find that on the basis of the reliable evidence, no reasonable juror would not have a reasonable doubt about whether Mr. Finch either was the killer or whether he was even present at the crime scene. Thank you. Thank you, Mr. Coleman. Um, we will ask the deputy to turn the court Senate died. They will reach over and greet council. But I want to note that, uh, Mr. Coleman and co-counsel that you were caught up on it on behalf of the fourth circuit. I want to thank you so much for representation. We depend on lawyers like you to help us. And we appreciate it very much. And we thank also council for ably representing the tie heels state of okay. Okay. All right. Yeah.
judges: Roger L. Gregory, Barbara Milano Keenan, Henry F. Floyd